[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a case tried to the court (December 7, 1990 — December 12, 1990) in which the plaintiffs seek to recover the sum of $50,000.00 representing a deposit paid by them pursuant to the terms of a contract between them and the defendant. Plaintiff claims the defendant was guilty of an anticipatory breach of that agreement. They claim, also, the agreement was CT Page 2204 void and unenforceable since it violates the statute of Frauds.
The defendant filed an answer and counterclaim.
The plaintiffs and defendant entered into a written contract for the purchase and sale of property owned by the defendant's decedent, Bessie K. Roby. The contract created a commitment on the part of both parties. It, in part, provides:
"SALE AND PURCHASE AGREEMENT
 THIS AGREEMENT made and entered by and between UNITED BANK AND TRUST COMPANY, Executor of the Estate of BESSIE K. ROBY of the Town of Berlin County, of Hartford and State of Connecticut, hereinafter referred to as the SELLER and JOSEPH L. DORIO and KENNETH J. DORIO, both of the Town of Berlin (Kensignton), County of Hartford and State of Connecticut, hereinafter referred to as the BUYERS.
 WITNESSETH that the said SELLER agrees to sell and the BUYERS agree to purchase, in consideration of the deposits listed below and in further consideration of the mutual promises of the parties hereto, that certain piece or parcel of land, together with all buildings and improvements thereon, situated in the Town of Berlin and shown on the Berlin Assessor's Map as Lot No. 10, Block 107.
The parties hereby agree as follows:
 1. The Full Purchase Price is ONE MILLION DOLLARS ($1,000,000.00) payable as follows: Ten Thousand ($10,000.00) Dollars deposit upon the execution of this Agreement, the receipt of which is hereby acknowledged by the Seller and an additional deposit of $40,000.00 upon acceptance of the proposal. Buyers will pay a further sum of FOUR HUNDRED FIFTY THOUSAND ($450,000.00) DOLLARS at the time of closing and the Seller will take back a purchase money first mortgage in the amount of FIVE HUNDRED THOUSAND ($500,000.00) DOLLARS with interest at the rate of ten (10%) percent. The said Seller agrees with the said Buyers that the said Seller will give a partial release as needed in proportion to the number of lots in the approved sub-division over a three (3) year period from date of closing. Interest and principal on each individual lot will be paid to the Seller upon the receipt of a release on said lot. In the event that all the lots are not released in the three (3) CT Page 2205 year period then any and all balances to the Seller shall be due and payable. This contract is subject to acceptance by the Seller on or before April 12, 1989.
2. ENCUMBRANCES: Said premises are to be conveyed subject to the following encumbrances:
 (e) This agreement is subject to the Buyers obtaining all approvals from either the State or the Town of Berlin for Inland/Wetland and any other approvals based on the zoning of R-43. Buyers will immediately upon the acceptance of the terms of this agreement apply for approvals from the various agencies and pursue said applications with due diligence. In any event, the buyer must proceed with the purchase of subject property if a plan of no less than twelve (12) lots is approved.
 9. LIQUIDATED DAMAGES: If the said Buyers shall fail to make the several payments, or any of them, as herein provided, they shall forfeit, as liquidated damages to the Seller, all claims to the premises described herein and to all the monies by them paid in pursuance of this Agreement. This provision, however, shall in no way affect the rights of either party to enforce the specific performance of this Agreement, or of proceeding with any other remedies available to them at law or in equity.
 This contract being subject to approval of the Trust Administration Committee of United Bank 
Trust Company — the Buyer hereby agrees to extend the acceptance date until April 25, 1989. In return the Seller hereby agrees not to solicit or entertain any other proposal for subject property."
Beginning on April 25, 1989, the defendant, Seller, United Bank Trust Company, now Fleet Bank of Connecticut, hereinafter, (Seller) removed the property from the market as to other potential purchasers, one of whom had offered to buy at a price only $11,000.00 less than the price settled upon between the parties to this action. The contract document itself was drawn by the plaintiffs. Upon the Sellers' acceptance of the contract the plaintiffs, Joseph Dorio and Kenneth Dorio, pursuant to the contract, deposited with the defendant the initial required payment of $50,000.00 thereby subjecting the same to the Liquidated Damages provision (Paragraph 9) of the agreement, heretofore set forth. The Buyers, inter alia, committed themselves to proceed in good faith and pursue their applications with "due diligence"; to close, in any event, if they were able to gain approval of a subdivision of at least 12 lots. CT Page 2206
It is established that the contract of sale became effective at the end of April 1989; that the Plaintiffs proceeded without delay to employ an engineer and retain special counsel; that by early fall (within approximately the first 5 months) the perimeter boundary survey and contours were completed. The assessment as to whether the Plaintiffs continued to diligently pursue the desired goal during the next 5 months, however, differs as between the two sides to the case.
The plaintiffs claim they were diligently proceeding with proposed lotting plans and the supporting amenities but that town authorities were making demands which the plaintiffs were unable to meet or resolve by alternatives and that those demands were the root cause of their delays in gaining required Town approvals. The plaintiffs further claim they were victims, themselves, free of fault, acting in good faith and exercising all due diligence. The plaintiffs did expend significant engineering costs and attorneys fees.
The Seller, almost at the outset, sought regular progress reports or information on Buyers' activities. From the time of that initial request to the end of September 1989, the Sellers awaited further progress reports. Sellers' Counsel was directed to write to the Buyers again requesting a report of progress. This letter was sent on October 12, 1989. A letter dated November 6, 1989 was sent to Sellers' Counsel enclosing a diary of the activities of Buyers' engineers up to October 25, 1989. This diary disclosed that by August 1, 1989, the tract perimeter and topographic surveys had been completed, and that the months of September and October had been consumed with meetings aimed at setting design problems (street, utility and lotting plans) to reconcile the view of town staff with Buyers as developer. The Seller, given that much input, reasonably expected that, giving limited added time, the Buyers and town authorities would settle details for an approvable subdivision plan. The Seller, nevertheless continued efforts to keep abreast of progress through conferences with the Buyers' attorney (their counsel for the subdivision process).
By the approaching end of January 1990, the Seller believed it still had not been given adequate information. Seller's attorney was told to call for a face-to-face meeting of all the parties. Attending were Joseph Dorio and his son, the Buyers attorney, their counsel for the subdivision, Mr. Landi, for the plaintiff, Mr. Murray, a real estate agent acting on behalf of the Seller, and the Attorney for the Seller. Although requested to be present, the Buyer's engineer did not attend. The intent of the Seller was to get clear and direct input from CT Page 2207 the engineer as to how close he felt the Buyers were to resolving the problems which were being claimed to be causing delay. Information given at that conference was essentially non-committal as to whether the Buyers and town staff people had resolved their differences. The answer to the question sought by the Seller as to what ought to be a reasonable timetable for getting approvals was answered.
Seller caused the sending of a letter to the Buyer's attorney for the subdivision dated February 26, 1990. By this time the Seller was seriously concerned about prospects for closing this sale and had growing doubts as to the Buyers' good faith. The end of a full 12 months of waiting for approvals to be obtained was looming. The defendant executor, Mr. Landi, sensed that the Seller was getting less than full and accurate reporting as to whether delays were the fault of the Town or whether the developer was looking for excuses to postpone getting approvals. Buyers claimed throughout this period that the Town Planning Commission was adamant that a "cluster" type development would be the only acceptable plan. From the limited information being given, the Seller concluded that if it set a target date for closing by June of 1990, that would be to allow the months of March, April and May to do what proved necessary to get approvals.
The letter of February 26th set a June target while insisting that the executor be "kept fully abreast of your actions and their results". The Buyers made no inquiry whether the June target date was unalterable, nor did they ask whether an extension might be considered. The Buyers never complained that they were unable to get approval of a least 12 building lots as specified by their agreement.
The Seller at this point had doubts that the Buyers were supplying complete and accurate information or revealing their true intentions. To satisfy that doubt, the executor decided it must fill the gaps in the information being volunteered by the Buyers. To do that, it was decided that Messrs. Landi and Murray would confer with the town planner. That visit was made and produced the following information: (a) the new town ordinance, which had been referred to as "cluster zoning" merely makes the use of "open space" available as an option to developers; while the town may encourage its use, it cannot be mandated; and (b) the Buyers' attempt to gain approval of a 26-lot subdivision could easily be revised to yield more than the 12-lot minimum set by the Buyers' agreement to buy. As a result, the executor had information which had never before been admitted or revealed by the Buyers.
Given this new input, the Buyers and their counsel were then summoned to another conference on April 12, 1990 at the CT Page 2208 Bank. All parties to the contract were present. The new information was reviewed with the Dorios and their counsel. They were invited and encouraged to make the changes in their plans which the town planner had suggested, with the assurance that as so modified the planner would recommend approval by his commission. They, the Buyers, were told that the time needed for the changes was estimated at two to three weeks. They were also advised that "cluster zoning" was a dead issue as to this subdivision; and that another issue, "the brook", issue could be settled simply by giving the town fee title rather than an easement. They were urged to proceed with the changes and go for subdivision approval. The Buyers refused to declare their intent to proceed accordingly.
The executor took that refusal as a clear showing of an ending of the Buyers' good faith performance of their obligations under the contract. The Seller was forced to elect one of two alternatives; retain — the reluctant Buyers and hope to persuade them to finish their performance; or declare the contract terminated and begin the search for a new buyer or buyers. The executor took the hard decision to terminate dealings with the Dorios. A letter of termination dated April 18, 1989 was then dispatched.
Upon receiving that letter, the Buyers made no effort to plead for a new time frame or to salvage the contract. Crossing the Seller's letter in the mails was a letter from Buyers' attorney for the subdivision dated April 19, 1990, which repeated the claim that cluster zoning was being imposed on the Buyers, pleading for a price break and asking for the return of the Buyers' deposit. The Buyers let their wetlands application entered November 17, 1989 be denied. That application had been dormant for five months.
The plaintiffs' seek a return of their deposit, they argue that the Seller in this case was the first to commit a breach which prevented performance by the plaintiffs. To define what is an "anticipatory breach", their brief cites from the decision in Koski, et al. v. Eyles, et al., 37 Conn. Sup. 861
(1981) at 862: "An anticipatory breach of contract occurs when a party communicates a definite and unequivocal manifestation of intent not to render the promised performance at the contractually agreed upon time. . . . (citations omitted) The manifestation of intent not to render the agreed upon performance may be either verbal or nonverbal: White v. Finch, 3 Conn. Cir. Ct. 138, 142, 209 A.2d 199 (1964); and is largely a factual determination in each instance.
When no specific time for performance has been agreed upon, the law provides that the performance must be made in a reasonable CT Page 2209 time. What would be a reasonable time to allow the plaintiffs to show a 12-lot subdivision was impossible must depend upon the terms of the sale and the circumstances surrounding the sale. This then is ordinarily a question of fact left to court determination. Loomis v. Norman Printers Supply Co., 81 Conn. 343,347 (1908): Rochester Distilling Co. v. Geloso, 92 Conn. 43,45; Wolfe, et al. v. Wallingford Bank Trust Co.,4 Conn. Sup. 128, 129-130 (1936); Robinson v. Commercial Contractors, Inc., 6 Conn. Cir. Ct. 398, 400-01 (1970).
Here the facts are that in order to induce the defendant to take the property off the market and hold it available to the Plaintiffs, the Plaintiffs agreed (a) that they would "immediately . . . apply for approvals . . .", (b) that they would "pursue said applications with due diligence." and (c) that "In any event, the buyers must proceed with the purchase of subject property if a plan of no less than twelve (12) lots is approved."
Given essentially a full 12 months to process their applications, the plaintiffs simply failed to test whether a 12-lot subdivision was eligible for approval. Such an approval was available had the plaintiffs seriously faced that question. There is no evidence that the plaintiffs were refused approval of a 12-lot plan for development. Their claim for refund is essentially based on an argument that they were not allowed enough time.
 "What constitutes a reasonable time within which an act is to be performed where a contract is silent upon the subject depends on the subject matter of the contract, the situation of the parties, their intention and what they contemplated at the time the contract was made, and the circumstances attending the performance."
17 Am.Jur.2d 765, Contracts, sec. 330.
The plaintiffs' commitment to proceed with "due diligence" in itself sets a time frame, as the parties intended it to do.
The defendant claims the plaintiff's failure to speedily and continuously pursue the accomplishment of the project to perform as agreed upon. The question then becomes: which party first repudiated his contract obligations? The plaintiffs' argument is premised on the claim that the defendant's letter terminating the contract was premature. That action might have constituted an anticipatory repudiation if the CT Page 2210 plaintiff's performance at that time had been in substantial conformity with their undertaking under the contract. Plaintiff's were then clearly not in substantial conformity.
 "Repudiation is actionable only in the absence of breach or repudiation by the other contracting party; only a party himself not in default has the right to claim that the other party's manifestation of an intention not to perform constitutes a breach of the contract."
Gilman v. Pedersen, 182 Conn. 582, 584 (1981).
The plaintiff also claims recovery on the basis of the statute of Frauds. The technical fault here is claimed to be the absence of a specific date for his client to finish the performance he has committed to make. The change of position which the Seller was induced to take by the Buyers' undertaking and performance continued for essentially a full year. It was cut off only when the Buyers signaled, by their refusal to leaving their performance incomplete.
Where proved, acts or forebearance of action which have been performed by the parties to a sale of real estate take the case out of the statute. Part performance of such nature as to be naturally accounted for in no other way than by the existence of a contract, as in this case, remove the function of the statute in order to prevent it from becoming an engine of fraud. Pearce Real Estate v. Kaiser, 176 Conn. 442, 443
(1979); Rutt v. Roche, 138 Conn. 605, 608 (1952).
The counterclaim filed by the defendant is as follows:
COUNTERCLAIM
1. The land subject to the contract between the parties must be sold to generate funds needed to pay Roby estate taxes and administration expenses.
2. Accordingly, the buy/sell contract had as its crux the plaintiffs' obligation to proceed with real "due diligence" to obtain the subdivision approvals required for residential development of the subject land.
3. The defendant was compelled to terminate the contract when, after being allowed twelve months of repeated delays, the plaintiffs declined to proceed to produce plans which would qualify for approvals. CT Page 2211
4. As a result of plaintiffs' failure to perform on their part as agreed, the defendant has incurred, and will continue to incur, the additional expenses of seeking a resale, surcharges accruing on unpaid estate and succession taxes and loss of income.
5. Defendant has been, and will be, obliged to seek and find as soon as may be a substitute buyer or buyers, leaving the resale price and extent of delay to be determined over time.
6. Defendant is exposed to added losses which can be expected to exceed the liquidated damages defendant has withheld under terms of the contract.
Wherefore, the defendant claims damages over and above any amount which may be found to be due the Plaintiffs; the net extent of defendant's damages is left to determination by the Court.
At the conclusion of the presentation of the evidence the court had no sufficient evidence before it to support a judgment beyond $50,000.00, i.e. the retention of the deposit already paid. This court finds on the evidence no sufficient support, for allowing other claimed items of damages over and above $50,000.00. In any event, those other items of claimed damages were not within the contemplation of the parties. In its brief (filed in Court December 11, 1990) the defendant wrote as follows:
 On the basis of both facts and law in this case, judgment should enter for the defendant, allowing it to retain the sum allocated to liquidated damages as partial compensation for the losses suffered by the Defendant Executor. Because of the palpable inadequacy of that sum to cover the total of losses sustained by the Roby estate, judgment should also include granting the executor the right in due course to a hearing in damages when the true scope of its losses can more accurately be ascertained.
No Connecticut case seems precisely and directly in point on a claim or request of this sort, i.e. leaving an assessment of damages to a future time. This court believes the general law applies here and requires that the defendant's request be denied. CT Page 2212
D. FUTURE OR PROSPECTIVE DAMAGES
Sec. 26. Generally.
 The law does not permit the owner of a single or entire cause of action or an entire or indivisible demand, without the consent of the person against whom the cause or demand exists, to divide or split that cause or demand so as to make it the subject of several actions. The entire cause must be determined in one action, and if suit is brought for a part of the claim, the judgment obtained precludes a second action for any remaining portion of the claim, even though the form of the second action is not identical with the first or different grounds of relief are set forth in the second suit. Hence, in estimating the pecuniary loss which a plaintiff has sustained as a result of the defendant's tort or breach of contract, all the consequences of the injury, future as well as past, are to be taken into consideration; the recovery, if any, must be for all the injuries and all damages resulting therefrom, whether past, present, or prospective, once and for all. In cases coming within the rule, a recovery may be had for prospective damages which are reasonably certain to accrue. To warrant a recovery for prospective damages in any case, they must be proved with reasonable certainty, and they must be such as the jury believes from the evidence will probably result to the plaintiff as the proximate damages from the wrongful act complained of.
 As a rule, an allowance for future damages must be reduced to its present worth. Therefore, the amount awarded for damage to be suffered in the future is such sum as, being put at interest, will amount (at the dates the damage will be suffered) to the sum the jury finds the plaintiff will lose in the future by reason of the alleged tort or breach of contract. The requirement of reduction to present worth has not, however, been applied in tort cases to the compensation awarded for pain CT Page 2213 and suffering reasonably certain to occur in the future.
22 Am. Jur. 2nd, Sec. 26 Damages, pgs. 46, 47.
Judgment may enter for the defendant on the complaint.
Judgment may enter for the defendant on the counterclaim in the amount of $50,000.00 (i.e. the right to retain a deposit of that amount already paid to the defendant) and costs.
LEONARD W. DORSEY SENIOR JUDGE